## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| T.D. MELCHIORRE, INC., <br><br> Plaintiff <br><br> v. <br><br> VICTORY FOODSERVICE DISTRIBUTORS CORP., <br><br> Defendant | CIVIL ACTION NO. 3:18-CV-1933 <br><br> (MEHALCHICK, M.J.) |

### **MEMORANDUM**

Plaintiff T.D. Melchiorre, Inc. initiated the present action by filing a complaint in the Court of Common Pleas of Luzerne County, Pennsylvania, on September 5, 2018. Defendant Victory removed the action to this Court on October 5, 2018, on the basis of diversity of citizenship. (Doc. 1). Victory filed its Answer to the Complaint on October 12, 2018, which included a counterclaim against Plaintiff T.D. Melchiorre, Inc. (Doc. 4). On October 22, 2018, Victory filed a Third-Party Complaint against Tipton Blue, LLC ("Tipton Blue"), George Febbraio ("Febbraio"), and Thomas Melchiorre ("Melchiorre"). Tipton Blue and Febbraio subsequently signed Waivers of Service of Summons. (Doc. 15; Doc. 16). Tipton Blue and Febbraio did not respond to the Third-Party Complaint, however, and the Court entered an Order of Default as to Tipton Blue and Febbraio on February 25, 2019. (Doc. 21).

On July 29, 2020, a mediation was held and Plaintiff, Victory, and Melchiorre resolved their claims. (*See* Doc. 55). On September 10, 2020, Victory filed a Motion for Entry of Default Judgment against Febbraio and Tipton Blue. (Doc. 54). This motion has been briefed by Victory, yet Febbraio and Tipton Blue have not responded. (Doc. 56).

**I.   DISCUSSION**

The entry of default judgment is governed by Rule 55 of the Federal Rules of Civil Procedure. Under subsection (a) of that rule, the Clerk of Court is instructed to enter a *default* against a defendant who "has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). "Entry of a default is a prerequisite to entry of a *default judgment* under Rule 55(b)." *Sys. Indus., Inc. v. Han*, 105 F.R.D. 72, 74 (E.D. Pa. 1985) (emphasis in original); *see also Enigwe v. Gainey*, Civil. Action No. 10-684, 2012 WL 213510, at *2 (E.D. Pa. Jan. 23, 2012) ("[A] default judgment under Rule 55(b) must be preceded by entry of a *default* under Rule 55(a).") (emphasis in original). Here, the Clerk of Court entered an entry of default as to Febbraio and Tipton Blue on February 25, 2019, satisfying the prerequisite pursuant to Rule 55(a). (Doc. 21).

Once the entry of a default under Rule 55(a) is entered, the party seeking default judgment is still not entitled to such. *Malibu Media, LLC v. Everson*, 2021 WL 84180, at *1 (M.D. Pa. Jan. 11, 2021). Rather, "a court is required to exercise sound judicial discretion in deciding whether to enter default judgment." *Kibbie v. BP/Citibank,* 2010 WL 2573845, at *2 (M.D. Pa. 2010). In making this determination, courts use three factors: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000). "[W]hen a defendant has failed to appear or respond in any fashion to the complaint, this analysis is necessarily one-sided; entry of default judgment is typically appropriate in such circumstances at least until the defendant comes forward with a motion to set aside the default judgment under Rule 55(c)." *Deutsche Bank Nat. Trust Co. v. Strunz*, 2013 WL 122644, at *1 (M.D. Pa. 2013).

The factors in this case weigh in favor of default judgment. If the motion were not granted, Victory would be prevented from recovering any damages for its claim because Febbraio's and Tipton Blue's lack of response freezes the action. This constitutes prejudice to the plaintiff. *See Chamberlain*, 210 F.3d at 164. Febbraio and Tipton Blue have not responded to the allegations so have failed to assert a defense. Thus, at this point they do not appear to have a litigable defense. *See Chamberlain*, 210 F.3d at 164. Finally, Febbraio and Tipton Blue have submitted no reasons for their failure to respond to Victory's Third-Party Complaint. They returned a signed waiver of service on November 26, 2018, evincing notice of the lawsuit. (Doc. 15; Doc. 16). Because they have provided no explanation for their failure to respond, they are deemed culpable. *See Malibu Media, LLC*, 2021 WL 84180, at *1. All three factors prescribed in *Chamberlain* weight in favor of default judgment.

Before entering default judgment, the Court "must consider whether the 'unchallenged facts constitute a legitimate cause of action.' Although the defaulting party does not concede conclusions of law, 'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" *Malibu Media, LLC*, 2021 WL 84180, at *2 (quoting *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) and *Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F. Supp. 2d 537, 541 (E.D. Pa. 2008)). In its Motion for Default Judgment, Victory asserts that it has set forth viable claims that Febbraio and Tipton Blue committed Pennsylvania torts of conversion and fraud, and that they were unjustly enriched to Victory's detriment. (Doc. 54). The Court must determine whether the Complaint's allegations, taken as true, state such claims.

A. THE COMPLAINT'S ALLEGATIONS

The facts alleged in the Third-Party Complaint against Febbraio and Tipton Blue, which are accepted as true for the purposes of determining whether Victory has stated a claim, are as follows.[1]

Victory had employed Febbraio as a salesperson in order to find goods directly from manufacturers or from manufacturers' agents offering the best pricing. (Doc. 9, ¶ 10). Unbeknownst to Victory, Febbraio conspired with Thomas Melchiorre to unlawfully markup products being purchased by Victory. (Doc. 9, ¶ 12). To complete their scheme, Febbraio created Tipton Blue as a shell corporation for the purpose of purchasing products that he would then resell to Victory through T.D. Melchiorre, Inc. ("TDM") for an inflated amount. (Doc. 9, ¶ 13).

Febbraio would send the original manufacturer invoices to Thomas Melchiorre for the purchases made by Tipton Blue using Victory's purchase order numbers. (Doc. 9, ¶ 14). Melchiorre would then fabricate invoices to hide the original cost of the products as they were sold from the original distributor to Febbraio's shell company (Tipton Blue) to TDM and then to Victory. (Doc. 9, ¶ 15). Febbraio would place purchase orders directly from Direct Link USA ("Direct Link"), a distributor[2] with a direct connection with Victory, using Tipton Blue as purchaser but using Victory's purchase order number.[3] (Doc. 9, ¶ 16). Link would then invoice Febbraio's company (Tipton Blue) directly for Febbraio's purchase orders. (Doc. 9, ¶

---

[1] Since Third Party Defendant Thomas Melchiorre is no longer a party to this action, all facts relevant only to him are omitted.
[2] In its Third-Party Complaint, Victory states that Direct Link was a "manufacturer," however the Affidavit of Anargyros Lathourakis, Financial Manager of Victory, shows that Direct Link was a distributor. (Doc. 54-1, ¶ 4).
[3] TDM was never an agent for Direct Link and TDM did not order products for Direct Link. (Doc. 9, ¶ 17). TDM would order products for Fuling Global ("Fuling"). (Doc. 9, ¶ 17).

18). Febbraio would provide Melchiorre and TDM with the information and costs from Direct Link's invoice. (Doc. 9, ¶ 19).[4] Febbraio would forward these invoices to Melchiorre and TDM. (Doc. 9, ¶ 20).

Melchiorre would then create falsified fabricated invoices for the same materials under TDM's letterhead with a new price in excess of 20% of the amount of what Febbraio's company had been invoiced from Direct Link for the purchases made by Tipton Blue using Victory's purchase order number. (Doc. 9, ¶ 21). Melchiorre would then submit the newly fabricated invoice under TDM's letterhead to Victory in an attempt to make it appear that the goods were purchased by TDM. (Doc. 9, ¶ 22). Melchiorre would send the fabricated invoices to Victory by way of Febbraio using TDM letterhead. (Doc. 9, ¶ 26). Febbraio would knowingly sign the fabricated invoices as having been received from Melchiorre despite the fact that they were received from Direct Link via Tipton Blue. (Doc. 9, ¶ 27). The fake invoices signed by Febbraio would then be sent to Victory for processing and payment. (Doc. 9, ¶ 28). Victory's accounts payable department, recognizing that the invoices were authorized by Febbraio, issued payment to TDM for the inflated false invoices. (Doc. 9, ¶ 29). Melchiorre and Febbraio would distribute the profits received from the inflated price paid by Victory among each other. (Doc. 9, ¶ 23).

Victory's account payable was unaware that the invoices were fabricated or inflated. (Doc. 9, ¶ 30). Febbraio performed absolutely no function to justify payment or the increased cost of goods to Victory. (Doc. 9, ¶ 31). Melchiorre and TDM performed absolutely no

---

[4] Again, the Third-Party Complaint states that this information would come from "the original manufacturer's invoice," however Lathourakis states that Tipton Blue corresponded with Direct Link, not the original manufacturer. (Doc. 54-1, ¶ 5).

function to justify payment or deliver the goods related to the Direct Link items and this scheme was prepared by Defendants exclusively to defraud Victory. (Doc. 9, ¶ 32).

### B. THE CONVERSION CLAIM

In Count I, Victory alleges conversion as to Febbraio and Tipton Blue. (Doc. 9, ¶ 35-39). Victory claims that by obtaining proceeds of Victory's payments, Febbraio and Tipton Blue unlawfully exercised dominion and control over Victory's property. (Doc. 9, ¶ 36).

Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp., Ltd.,* 974 F.Supp. 822, 844-45 (E.D. Pa. 1997) (citation omitted). Under Pennsylvania law, a plaintiff must establish (1) the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, (2) without the owner's consent, and (3) without lawful justification. *Vavro v. Albers*, 2006 WL 2547350, at *13-14 (W.D. Pa. 2006) (citing *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n.3 (Pa. Super. 2000)). Money can be the subject of a tort of conversion in Pennsylvania. *Vavro*, 2006 WL 2547350, at *14. A plaintiff has a cause of action for conversion when he "had actual or constructive possession of a chattel or an immediate right to possession of a chattel at the time of the alleged conversion. *Chrysler Credit Corp. v. Smith*, 643 A.2d 1098, 1100 (Pa. Super. 1994).

In *Broederdorf v. Bacheler,* 129 F. Supp. 3d 182 (E.D. Pa. 2015), the court addressed a case similar to the one at bar in that the chattel at issue was money which had allegedly wrongfully changed hands. The plaintiff in *Broederdorf* was the personal representative of the estate of a woman who had been the founder and sole owner of a medical escort service which supplied nurses to accompany travelers who had fallen ill or suffered injury while traveling

abroad. *Broederdorf,* 129 F. Supp. 3d at 189. The defendant, an employee of the company, had signed an agreement giving him the right of first refusal to purchase the company upon the death of the owner and provided for him to purchase a life insurance policy on the owner as a means of paying for the company's purchase. *Broederdorf,* 129 F. Supp. 3d at 189-90. Upon the owner's death, however, the defendant was paid one million dollars in proceeds from the life insurance policy, as he had made himself the primary beneficiary under the policy, but declined to purchase the company. *Broederdorf,* 129 F. Supp. 3d at 190. He refused to turn those proceeds over to the estate and, according to the complaint, "had [the company's owner] known that [defendant] would decline to purchase [the company] and attempt to keep the proceeds for his own use, she never would have permitted him to acquire an insurance policy on her life." *Broederdorf,* 129 F. Supp. 3d at 191. In analyzing the conversion claim, the court determined that the plaintiff pleaded that the owner's estate had a right to the insurance proceeds from the policy pursuant to agreements signed by the owner and employee-defendant, that the defendant denied the owner's estate this right when he made himself the primary beneficiary of the life insurance policy, and that the estate had actual or constructive possession of the right to the proceeds when it was the primary beneficiary under the life insurance policy on the owner. *Broederdorf,* 129 F. Supp. 3d at 198. Thus, the plaintiff had pleaded sufficient facts to state a plausible claim of conversion. *Broederdorf,* 129 F. Supp. 3d at 198.

In the instant case, Victory claims that Febbraio and Tipton Blue "unlawfully exercised dominion and control over Victory's property," giving rise to conversion. (Doc. 9, ¶ 36). Victory alleges that it had a right to the excess invoice amount because Febbraio did nothing to justify payment of the increased costs of goods to Victory. (Doc. 9, ¶ 31). Febbraio

and Tipton Blue deprived Victory of this money when they submitted invoices to Melchiorre for Melchiorre to falsify with inflated prices and pass on to Victory. (Doc. 9, ¶¶ 13, 20-22). Before making its payments pursuant to these falsified invoices, Victory had actual possession of the money. (Doc. 9, ¶¶ 29-30). In *Broederdorf*, the plaintiff claimed that he was entitled to money through a life insurance policy which the defendant unilaterally changed, causing the money to be distributed to the defendant. *Broederdorf*, 129 F. Supp. 3d at 198. Here, Victory claims that Febbraio and Tipton Blue falsified invoices causing Victory's money – the amount paid as a result of the invoices' inflation – to be wrongly distributed to Febbraio and Tipton Blue. (Doc. 9). In both cases, the money was not physically taken by the defendants, rather it flowed from the plaintiffs to the defendants via deceitful means. Just as the scheme in *Broederdorf* gave rise to a conversion claim, so does Febbraio's and Tipton Blue's. *See Broederdorf*, 129 F. Supp. 3d at 198. Victory pleads that there was no justification for the inflated price and that Victory was unaware that the invoices were fabricated or inflated. (Doc. 9, ¶¶ 30-31). Thus, the remaining two elements identified in *Vavro* are also satisfied. *See Vavro*, 2006 WL 2547350, at *13-14.[5] Victory has pleaded sufficient facts to plausibly state a claim for relief under the tort of conversion.

    C.  THE FRAUD CLAIM

In Count II, Victory claims that it was defrauded by Febbraio and Tipton Blue. (Doc. 9, ¶¶ 40-48). Victory states that Melchiorre drafted fictitious invoices and submitted them to

---

[5] The fact that Victory signed the money over to Febbraio and Tipton Blue does not preclude the conversion claim. Under Pennsylvania law, taking a person's property with consent to use the property for one purpose but with the intent to use it for another purpose may be a conversion. *Knuth v. Erie-Crawford Dairy Co-op. Ass'n*, 463 F.2d 470, 478 (3d Cir. 1972). Therefore, *a fortiori*, taking a person's property with consent but under false pretenses may also be a conversion.

Febbraio who then, knowing they were fictitious, submitted them to Victory for payment. (Doc. 9, ¶¶ 41-42). Febbraio and Tipton Blue intended Victory to rely on the information in the invoices signed by Febbraio and Victory did rely on the information to its detriment. (Doc. 9, ¶ 43). Since Febbraio was an employee of Victory, Victory was justified in relying on the information contained in the invoices which were approved for payment by Febbraio. (Doc. 9, ¶ 44).

Under Pennsylvania law, "[t]he essence of fraud is a misrepresentation fraudulently uttered with the intent to induce the action undertaken in reliance upon it, to the damage of its victim." *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1072 (Pa. Super. 2003). The elements of fraud are: "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon,* 729 A.2d 555, 560 (Pa. 1999).

Victory's Third-Party Complaint makes out a plausible claim of fraud against Febbraio and Tilton Blue. (Doc. 9). Victory alleges that Febbraio and Tilton Blue made representations in the form of the invoices and that these invoices were material to the transaction at hand in that they catalyzed the payments from Victory to Febbraio and Tilton Blue. (Doc. 9, ¶¶ 19-28). Victory alleges that the content contained in the invoices was false and that Febbraio and Tilton Blue knew it was false. (Doc. 9, ¶¶ 19-21, 27-28). Victory states that Febbraio and Tilton Blue intended for Victory to rely on the invoices and on his signature, which signified authorization. (Doc. 9, ¶¶ 28-29). Victory justifiably relied on the invoices, since they were authorized by Febbraio. (Doc. 9, ¶¶ 29, 44). Finally, this fraudulent scheme and Victory's

reliance on Febbraio's representations proximately caused pecuniary damages. (Doc. 9, ¶ 46). Victory has satisfied all six elements of a claim of fraud. *See Bortz v. Noon,* 729 A.2d at 560; *see also Piezo Crystal Co., a Div of PPA Industies, Inc. v. Uddeholm Corp.*, 870 F.Supp. 589, 594-96 (M.D. Pa. 1994) (upholding claim of fraud based on invoices containing false information).[6]

### D. Damages

As Victory has stated legitimate causes of action, the next step is to determine the amount of damages to which Victory is entitled. Normally, damages must be established at an evidentiary hearing. However, if the amount of damages "can by computation be made certain," then a hearing is unnecessary. *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

Victory asks for $422,548.46 from Febbraio and Tipton Blue, stating that this was the loss it suffered as a result of their conduct. (Doc. 56, at 9). They arrive at this number by first using the invoice and payment histories to calculate the total purchases Victory made from TDM since the beginning of the fraudulent scheme: $3,521,237.20. (Doc. 56, at 9). Victory's Financial Manager certifies that this number is correct. (Doc. 54-1, ¶ 3) (citing Doc. 54-2). According to Victory, the average markup that Febbraio and Tipton Blue took prior to fraudulently invoicing Victory was 12%. (Doc. 56, at 9). Again, Victory's Financial Manager certifies that this was the average markup taken by Tipton Blue prior to invoicing Victory.

---

[6] Since Victory's unjust enrichment claim arises from the same alleged conduct as the fraud and conversion claims, as a matter of law Victory states a valid claim of unjust enrichment. *See SodexoMAGIC, LLC v. Drexel University*, 333 F. Supp. 3d 426, 473 (E.D. Pa. 2018) ("Where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim.").

(Doc. 54-1, ¶ 2).[7] The total amount of inflation is calculated by taking twelve per cent of $3,521,237.20, resulting in $422.548.46. (Doc. 54-1, ¶ 7). This wrongful inflation is what Victory asks for in damages. (Doc. 56, at 9-10). The Court agrees that this figure accurately represents the damages suffered by Victory as a result of Febbraio's and Tipton Blue's misconduct.

II. CONCLUSION

Victory's Motion for Default Judgment is **GRANTED**. The Court awards Victory $422,548.46 in compensatory damages.

An appropriate Order follows.

Dated: February 8, 2021            *s/ Karoline Mehalchick*
                                   **KAROLINE MEHALCHICK**
                                   **United States Magistrate Judge**

---

[7] The Financial Manager states that the average price adjustment for the invoices on record was only 11.72%, however it is the Court's understanding from the limited dates on these invoices that they were only a sample. (Doc. 54-1, ¶ 5) (citing Doc. 54-3).